(Decided 16th March, 1887.)

JAMES E. RABBITT, and others *vs.* SUSANNA V. GAITHER.

*Dower—Equitable estate of Husband—Fraudulent conveyance to Defeat claim to Dower.*

On the 10th of November, 1879, G., who in June, 1879, had married his second wife, purchased a farm at a trustees' sale, and paid the purchase money to the trustees. Before the sale was ratified he procured an order from the Court by which C., a grand-niece of his first wife, was substituted as purchaser in his stead. The sale was afterwards ratified as made to C., and the trustees thereupon exe-cuted a deed conveying the land to her absolutely and unconditionally. On a bill filed by the second wife of G. after his death, to have dower laid off and assigned to her in said land, and claiming that the substitution of C. in the place of G. as purchaser and having the deed made out to her, was done with the fraudulent intent to deprive the complainant of her dower, it was HELD :

Rabbitt, *et al. vs.* Gaither.

That the fraudulent intent on the part of G. was established by the evidence, and the complainant was entitled to dower.

Whether it was necessary to prove that C. had knowledge of such fraudulent intent at the time the farm was conveyed to her, and participated therein. *Quaere?*

APPEAL from the Circuit Court for Montgomery County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, and BRYAN, J.

*Richard R. Beall,* and *William P. Maulsby, Jr.,* for the appellant.

*Thomas Anderson,* and *Arthur W. Machen,* for the appellee.

The statute gives dower in lands held by equitable title. Art. 45, sec. 5 of the Code (Act of 1818, ch. 193, sec. 10.)

And it is a fraud upon the wife to attempt to cheat her of her dower in such land. The circumstance that the equitable title may be aliened without the wife's concurrence, whereas the legal title cannot be, is immaterial, where the conveyance is not *bona fide,* but is fraudulent as against her, and therefore, so far as her rights are concerned, void.

Nothing can be more completely alienable, at the pleasure of the husband, than his personal property; yet it is well settled that a conveyance of personal property made for the purpose of defeating the wife's legal rights is *null* and *void* as against her. *Hays vs. Henry,* 1 *Md. Ch. Dec.,* 337; *Dunnock vs. Dunnock,* 3 *Md. Ch. Dec.,* 140; *Feigley vs. Feigley,* 7 *Md.,* 562; *Sanborn vs. Lang,* 41 *Md.,* 113. And even if the conveyance of an equitable

title is free from fraud, it will not *always* bar dower. *Bank of Commerce vs. Owens*, 31 *Md.*, 325.

What constitutes adequate evidence of fraud appears from *Sanborn vs. Lang*, 41 *Md.*, 107, before cited.

The doctrine that the wife's right to dower is protected in equity against any conveyance made by the husband with intent to defeat it, is well established by authorities elsewhere. 2 *Scribner on Dower*, 163 ; *Chandler, et al. vs. Hollingsworth, et al.*, 3 *Delaware Ch.*, 99 ; *Brown vs. Bronson, et al.*, 35 *Mich.*, 415 ; *Swaine vs. Perine*, 5 *Johns. Ch.*, 482 ; *Petty vs. Petty, et al.*, 4 *B. Mon.*, 217, 219; *Jiggitts, et al. vs. Jiggitts*, 40 *Mississippi*, 718 ; *Youngs vs. Carter*, 10 *Hun, N. Y.*, 194.

The fact that such a conveyance may carry out a previous purpose, not communicated to the wife, as to settle property conveyed to the husband by a former wife upon her family, is immaterial. *Brown vs. Bronson*, 35 *Mich.*, 415, 418.

Where a husband with his own money purchased land, but, for the purpose of defrauding his wife of her right of dower therein, caused the conveyance to be made of a life estate only to himself, with remainder in fee to his daughter, it was held that the vendor's conveyance of the remainder to the daughter would be treated in equity as the husband's conveyance ; and that in respect to the widow's dower right the husband would be taken to have been seised of an estate in land which he had afterwards conveyed away. *Crecelius vs. Horst*, 4 *Missouri Appeal*, 419.

As to the favor with which the wife's right to dower should be regarded, see *Read vs. Whitney*, 7 *Gray*, 533.

The correlative doctrine of the invalidity of ante-nuptial conveyances, by a wife in fraud of the marital rights of her intended husband, cases for the application of which have more frequently arisen in England, is well settled both there and here. 1 *White & Tudor's Lead. Cases*, 405,

*et seq., notes to Countess of Strathmore vs. Bowes ; Cole vs. O'Neill,* 3 *Md. Ch. Dec.,* 174.

MILLER, J., delivered the following opinion.

This case was assigned to me to prepare the opinion of the Court therein. The record is a large one and the testimony voluminous. The questions of law involved are important, and those of fact depend upon a close scrutiny of the testimony and great care in deducing conclusions therefrom. The duty thus imposed I discharged to the best of my ability, but the conclusions I have reached have not in all respects met the approval of my brothers who heard the case with me, and they are in favor of the affirmance of the decree *in toto.* The parties, however, in this, as in every other case, are entitled to the best considered judgment of each Judge who heard it, and instead of a silent dissent I have deemed it proper to express my views at some length, the excuse therefor being such as I have stated.

The bill was filed by Susanna V. Gaither to have dower laid off and assigned to her in all the lands of her deceased husband, James B. Gaither, who died in February, 1885, and the only controversy made in this Court relates to her right to dower in what is called the "Locust Grove farm" containing about one hundred and fifty acres.

Mr. Gaither was twice married. His marriage with the complainant took place on the 17th of June, 1879, about seven months after the death of his first wife. He had no children by either marriage, but had taken to his home when she was a child, Emily V. Cecil, a grand-niece of his first wife. This child was treated as a daughter by him and his wife, and was raised and educated by them as such. They were both devotedly attached to her, and she with equal devotion and affection regarded them as her parents. The legal title to all the lands mentioned in the bill, except this Locust Grove farm, was devolved

upon Mr. Gaither by the will of his first wife, executed in August, 1871, and it appears that when he was first married he had very little property of his own.  He purchased the Locust Grove farm at a trustees' sale on the 10th of November, 1879, after his second marriage, for $2300 cash, and paid the money to the trustees, but before the sale was ratified he procured an order from the Court by which Emily V. Cecil was substituted as purchaser in his stead, and the Court afterwards ratified the sale as made to her as purchaser, and the trustees thereupon executed a deed conveying the land to her.  This deed bears date the 17th of January, 1880, recites the order substituting Emily V. Cecil as purchaser, and conveys the property to her absolutely and unconditionally.  Miss Cecil, the grantée, afterwards, on the 30th of November, 1882, married James E. Rabbitt, and she and her husband subsequently in October, 1884, sold and conveyed the land to John S. Crawford, one of the defendants to the bill.

From these facts, about which there is no dispute, it is apparent that Mr. Gaither was never vested with the legal title to this farm.  By his purchase from the trustees and payment of the purchase money he acquired an equitable interest therein, but, so far as appears from the face of the papers, he held such equitable title at least *not longer* than up to the date of the deed from the trustees. If then there was nothing more in the case, there would be no difficulty in deciding that the complainant was not entitled to dower in this land.  In this State the right to dower has always been regulated by the *common law*, with the single modification thereof made by the Act of 1818, ch. 193, which provides that "a widow shall be entitled to dower in lands *held* by equitable title in the husband, but such right of dower shall not operate to the prejudice of any claim for the purchase money of such lands, or other lien on the same." *Code, Art.* 45, *sec.* 5. This statute was construed by the Court of Appeals in

Rabbitt, *et al. vs.* Gaither.

*Hopkins vs. Fry*, 2 *Gill*, 359, and *Stump vs. Miller*, 3 *Gill*, 304, and in the latter case the Court declared that this Act " does not say, and it *ought not* to be construed *to mean*, that the widow shall be entitled to dower in lands *held* by equitable title in the husband *at any time* during the coverture." By this the Court undoubtedly decided that this Act does not give to the wife the same right of dower, indefeasible except with her consent, where the husband holds or acquires an equitable title, that the common law gives her where he holds or acquires the legal title, and such has been its accepted construction ever since that decision was made. It has always been held that an absolute sale and transfer of an equitable interest in land, by the husband alone during his life, will bar all claim to dower. It was so decided by the Chancellor in *Bowie vs. Berry*, 1 *Md. Ch. Dec.*, 452, and this doctrine is in no wise impugned by the decision of this Court in *Bank of Commerce vs. Owens*, 31 *Md.*, 320. In that case the husband was seized of the legal title in the land upon which therefore the wife's inchoate right of dower had attached at common law. She had joined her husband in the execution of mortgages, and the property was afterwards sold under a deed of trust executed by the husband alone, for the purpose of paying all mortgages and incumbrances according to their legal priority, and the Court held that she was dowable of the *surplus*, after payment of the mortgages in which she had joined, and that this was her right at the common law. That was all that was actually decided in that case, but it may be inferred from what the Court said in its opinion, as well as from the decision of the Chancellor in *Mantz vs. Buchanan*, 1 *Md. Ch. Dec.*, 205, and of this Court in *Lynn vs. Lynn*, 27 *Md.*, 547, that the same result would follow in the case of a *simple mortgage* of an equitable interest, though the Chancellor in *Purdy vs. Purdy*, 3 *Md. Ch. Dec.*, 547, seems to have regarded a mortgage as a transfer or parting with the equitable

estate. But no such questions arises in the present case. There is here no mortgage, nor any claim to a surplus. The claim is for the assignment of dower in the land, and from the construction placed upon this Act of Assembly by all these decisions, it seems to me quite clear, that the husband has the same power of absolute alienation over an equitable interest in land, that he has over his personal property, and that the same alienation that will defeat the widow's right to a distributive share in the one, will defeat her claim to dower in the other.

But the complainant charges in her bill that her deceased husband adopted the plan of having this farm conveyed to Emily V. Cecil, for the purpose of cheating and defrauding her of her dower in his estate; and it is contended that the whole arrangement was a scheme devised and carried out to accomplish that purpose; that Miss Cecil was made the mere nominal holder of the legal title while Gaither remained the real and substantial owner, and that such was the understanding between them when the transaction took place. Before considering the testimony upon which this grave charge is founded, it is well to ascertain clearly what the law upon this subject is, and in doing this, reference must be made to the Maryland decisions only, because they alone are *binding* authorities in the case, and it would seem that they have settled the question.

In *Hays vs. Henry*, 1 *Md. Ch. Dec.*, 337, a bill was filed by a widow for relief against certain conveyances of leasehold property, (a house and lot,) as made in fraud of her rights. The husband was living apart from his wife, and with a woman by whom he had children. He bought the property with his own money, and had it conveyed to the woman who a few days afterwards conveyed the same to him upon certain trusts; but this trust deed contained a covenant that he should hold and use the property without hindrance from her, and he lived and died in the

house.   Both deeds were recorded on the same day, and were parcels of the same transaction.   In deciding the case the Chancellor lays down the law in very clear and emphatic terms, to the effect that while a husband cannot by a *will* deprive a widow of her share of his personal property, there can be *no doubt* of his power to dispose of such property *absolutely* during his life, without the concurrence of his wife, and free from any claim on her part, provided the *transaction* is not merely *colorable*, and be unattended with circumstances indicative of fraud upon her rights.   "If the disposition" says the Chancellor, "by the husband be *bona fide*, and no right is reserved to him, then, *though made to defeat the claim of the wife*, it will be good against her, because an act cannot be denounced as fraudulent which the law authorizes to be done.   But if it be a mere device or contrivance, by which the husband, not parting with the absolute dominion over the property during his life, seeks, at his death, to deny his widow that share of his personal estate which the law assigns to her, then it will be ineffectual against her." He then proceeds to decide the case before him, and decides it for the widow, upon the express ground of the reservation in the deed of trust, in favor of the husband, and his continued possession of the property down to the time of his death.   In speaking of the purpose of the transaction he says,  " that purpose, I am fully convinced, was to deprive the complainant of her share of her husband's estate," and adds, "this purpose there is no doubt, could have been accomplished by an absolute and unconditional alienation of the property by sale or *gift;* and, although such alienation was made *with the intent imputed to this act,* it would not vitiate it, provided there was a transfer of the possession as well as the title, and no reservation whatever to the husband."   It is plain from the whole tenor of the Chancellor's decision in this case, that when he declared that the disposition made by the hus-

band must be *bona fide,* he had no reference to good faith on the part of the husband towards his wife, but to the transaction itself as between the husband and his grantee or donee. The plain meaning of his language is that the transfer by the husband, whether by sale or gift, must be absolute and unconditional, and not colorable merely.

In *Dunnock vs. Dunnock,* 3 *Md. Ch. Dec.,* 140, there was a bill by a wife for alimony out of the estate of her husband who had abandoned her, and the charge was that he had conveyed away by bill of sale certain negro slaves, with a design to defraud her of her right to a reasonable maintenance, and of all interest, present or prospective, in these slaves. The Chancellor found upon the proof that the bill of sale was absolute on its face, was accompanied with delivery of possession, and that there was no such reservation of right in the husband as to "defeat his unquestionable right to give away his personal property to the prejudice of his wife's claim to a distributive share after his death," and denied the relief prayed. There was parol proof of a written agreement between the grantor and grantee that the latter should return the negroes to the former when he should call for them or forfeit $1200. This proof was not admitted, but the Chancellor held that such an agreement would not have affected the case even if it had been proved, because it did not *bind the grantee* to return the property, but only to do so or pay $1200. In this case the Chancellor re-affirmed the law as he had stated it in *Hays vs. Henry,* and in the course of his opinion, said : "It is not enough to show that the conveyance, assuming it to be without a valuable consideration, was made to defeat the claim of the wife ; that the law allows the husband to do by gift, so far as his personal estate is concerned, provided there be no right reserved to himself, and is *not a mere fiction,* by which, not divesting himself of the dominion over his property during his life, he attempts after his death to deprive her of her distributive share thereof."

Rabbitt, *et al. vs.* Gaither.

In *Feigley vs. Feigley,* 7 *Md.*, 537, a wife filed a bill for a divorce and alimony. She subsequently amended her bill, and charged that her husband in order to deprive her of all hope of any provision out of his property, and confederating with his sister for that purpose, had executed a deed conveying to the latter all his interest in the estate of his deceased father, for a trifling and pretended consideration; that this conveyance was merely fictitious and not intended really to deprive the grantor of the benefit of this estate, but to save the same for his own use, and the sister was brought in as a party to the suit. The case was elaborately argued, and the Court after deciding that the wife had, under the terms of the Statute of *Elizabeth,* a standing in Court to impeach the deed, considered the question whether it was a *bona fide* transaction, or the result of a deliberate purpose to defraud the wife of her claim to alimony. Upon this question they say they had no doubt but that the deed was executed by the husband in fraud of her rights, but that there was no direct or sufficient proof, (in face of the denials in her answer,) of any *fraudulent participation* by the sister in the transaction, and that there was no such glaring inadequacy of consideration, as would of itself stamp the transaction with fraud, and thereby render the deed void. They therefore reversed so much of the decree below as vacated this deed, and refused to allow the wife alimony because the husband had no estate out of which it could be allowed. There is plainly nothing in this decision which overrules or modifies the law as laid down by the Chancellor in the cases above cited.

In *Sanborn vs. Lang,* 41 *Md.*, 107, a widow filed a bill to vacate a deed of real and personal property executed, as she averred, by her husband, in contemplation of his death, and with the avowed and express purpose of depriving her of her distributive share of his estate. It was conceded she was entitled to dower in the real estate, the

husband having had the legal title thereto, and the controversy was over her right to her share of the personal property. The Court conceded that the legal principles involved, were stated with substantial accuracy by the Chancellor in *Hays vs. Henry,* but the facts showed there was a reservation of an interest in the grantor, and that he remained in possession of the property until his death. The gist of the Court's opinion in this case, is in the following extract: "The facts that the power of attorney was prepared at Sanborn's instance, and sent on to be executed before the deed was made; that it secured to him the unlimited right of disposing of the property as owner, that he did so deal with it, by having a portion of it mortgaged to obtain money for his own use; and that he remained in possession of it till his death, conclusively show, that though the deed was absolute on its face, the intent and purpose of the transaction, *and of the parties,* was, that while Sanborn retained dominion and control over the property in his life-time, his wife should have no part or share of it after his death. This being so, the case falls directly within the principles laid down by the Chancellor in *Hays vs. Henry,* and by this Court in *Feigley vs. Feigley.* The deed was not made *bona fide,* but as respects the wife was fraudulent, and cannot operate to deprive her of her legal rights as widow and distributee."

The fair conclusion from these authorities is, that a husband may alienate his personal property and his equitable interest in land, either by sale or gift, without the concurrence or assent of his wife, and if the transfer be absolute and unconditional, and without any reservation of interest in, or control over, the property to himself, and if the possession be parted with or delivered in pursuance of the conveyance, it is valid even though his intent and purpose in making it, may have been to deprive his wife of her dower or thirds therein, provided there be no fraudu-

lent participation on the part of the grantee or donee in such intent or purpose. In fact, this power of the husband over such property, has been so long recognized by the Courts, and so often exercised, as to have become not only a well-established principle of law, but a settled rule of property upon which a large number of titles depend. But on the other hand, if the transfer be colorable merely, that is to say, if it be a mere device or contrivance by which the husband does not part with the absolute dominion over the property during his life, but seeks thereby to defeat the claims of his widow at his death, the law pronounces it a fraud upon her rights, and this fraud may be proved and established by his retention of possession, during his life, by a reservation of an interest to himself on the face of the conveyance, or by any outside agreement or arrangement between him and his grantee or donee, to the effect that he shall receive the benefit of, or have control over, the property, during his life, or by any other fraudulent participation on the part of the grantee or donee to aid him in his purpose of defeating the rights which the law gives to his widow upon his death.

The question then is, does the proof in this record make out a case of such fraud in the transaction relating to this farm? The testimony is voluminous, and all that can be expected in an opinion is a statement of the facts bearing upon the material points, established by the preponderance of proof.

It appears then, that at the date of Mr. Gaither's second marriage, the favorite and petted child, Emily, had grown to womanhood, and after the marriage, she and the new wife did not get along well together, though there is no proof of any open rupture between them. Mr. Gaither then determined to provide her with a separate home and residence, and accordingly purchased this farm, and had the title conveyed to her, in the manner already stated. The deed from the trustees was absolute on its face,

without any reservation or condition whatever, and was promptly delivered and recorded. In December, 1879, shortly after his purchase, and before the deed had been executed by the trustees, Mr. Gaither fitted up and furnished the house upon the farm, and Emily went there to live, and her brother, John F. Cecil, lived with her up to the time of her marriage on the 30th of November, 1882. During the three years prior to her marriage, Mr. Gaither cultivated the farm and received the proceeds of the crops, but at the same time improved the place by clearing up, ditching and liming the land. and putting up new fences. When the marriage took place, he attended a reception given at the house, and there, in the presence of a number of witnesses and guests, he declared he had given her this farm, and that there was not the "scratch of a pen against it," and then addressing the young couple, said, "now my children you must go to work, and do the best you can." After this, and up to the time of his death in February, 1885, he was never in possession of the property. All this is quite consistent with what a father upon his second marriage, would have done under similar circumstances, for a grown-up and unmarried daughter, by his first wife, to whom he wished, and was able, to make an advancement.

But it appears that on the 12th of June, 1879, five days before his marriage to the complainant, he also conveyed certain personal and real property in Gaithersburg to Emily V. Cecil, the consideration therefor, as stated in the deed, being love and affection, and "her devoted attention to me" (the grantor) "for years past." But by this deed he reserved a life estate in the property to himself, and moreover, did not deliver it until some weeks or months after his marriage, and no question is made as to the complainant's right to dower in this real estate. He also took from the grantee an agreement in writing to reconvey this property to him in fee simple, at any time he

Rabbitt, *et al. vs.* Gaither.

should call upon her to do so, under a penalty of $5000, but this agreement was executed after, though it is dated before, her marriage. In February, 1883, Mr. Gaither desired to have the reversionary interest in this Gaithersburg property conveyed to John F. Cecil, the brother of Mrs. Rabbitt, and the latter seems to have been willing to execute such a deed, but her husband refused to join in the conveyance, and in this refusal was supported by his father. This brought about a bitter quarrel between Gaither and the Rabbitts, and the former instituted an action at law against Mrs. Rabbitt and her husband upon two sealed notes or single bills, each for $3000, payable on demand, and bearing interest from date, and both purporting to have been signed by Mrs. Rabbitt before her marriage. The first bears date the 22nd of March, 1882, and is a renewal of another one to the same effect which had been accidentally destroyed. This one was signed by her before her marriage. But the second, though dated the 17th of June, 1879, was in fact signed by her in her maiden name in March, 1883, after her marriage. Mrs. Rabbitt and her husband then filed a bill in equity for an injunction to restrain the prosecution of this suit, upon the ground that these notes were without consideration and void. The bill states at length the circumstances under which and the purposes for which these notes were given, and prays that they be delivered up and cancelled. A preliminary injunction was granted, and in his answer to the bill, Mr. Gaither disavowed all intention of proceeding upon the second note, and in the *narr.* which he afterwards filed in the law case, he declared only upon the first. He insisted in his answer that this note was given upon a valuable, valid and sufficient consideration, that he required it of her when the Locust Grove farm was deeded to Emily V. Cecil, and denied that the transaction was a gift to her. This suit was a protracted one, and was prosecuted with much bitterness on both sides. Mr.

Gaither died before it was decided, but after he had testified, and his executors were made defendants. The position taken by Mrs. Rabbitt in her testimony, was that she executed the note upon the representation of Mr. Gaither, in whom she placed implicit confidence and trust, that he wanted it in case she should die before he did, so that her relations in St. Mary's County could not get the property, and that it should only be used in that event; that she kept it in her own possession, and delivered it up to him in March, 1883, and executed the other note at his instance and upon his suggestion, that in his hands they could be used as a means of inducing or making her husband unite in the conveyance of the Gaithersburg property to her brother, while that of Mr. Gaither was, that he had required her to give him this note *as security* for the purchase money he had paid for the Locust Grove farm. The Court reviewed the testimony in an elaborate and able opinion, decided the case in her favor, and passed a decree (from which no appeal was taken) making the injunction perpetual and cancelling both notes. The Court held that the proof showed that Mr. Gaither made a *free and voluntary gift* of this farm to Mrs. Rabbitt, and that the note was without consideration and was executed under the circumstances and for the purpose stated by her in her testimony.

The present complainant was not a party to that suit, and of course is not bound by the decree or by anything said in the Court's opinion. But the record and testimony taken in that case was offered in evidence in this, and is therefore to be considered. The testimony which bears upon the question whether there was any fraudulent participation on the part of Mrs. Rabbitt in the supposed or actual intent of Mr. Gaither to defeat his wife's right of dower in this land, is mainly that of Mr. Gaither and Mrs. Rabbitt. The latter was not examined as a witness in the present case. She died before it was decided,

leaving two infant children, who have been made defendants. The testimony of the other witnesses in both cases throws very little light upon the question now under consideration. Her testimony shows that she had the utmost confidence in Mr. Gaither, who stood to her *in loco parentis*, that he was her adviser in all business matters, that she did whatever he required, that she looked upon him as a father, was grateful to him for his kindness and benefactions, and it may be fairly inferred that had she remained unmarried, she would have devoted this property as well as everything else she had to his use, if his necessities had required such a sacrifice. On cross-examination she was asked, "was it not understood between you and Mr. Gaither that he was to use and farm this place as long as he lived, or thought proper to do so," and her reply was "yes, sir, he was to use it as long as he lived, but never to sell it from me, but *after I was married, he gave it up to me*, and said now let my husband work it, that he was not going to work it any longer; he said he was buying lime and fixing it up for me, and he wanted me to stay there as long as I lived, and never to sell it." Her husband also testified that about two weeks after his marriage, Mr. Gaither said to him, "I give up this place to you and all that is on it, except my wheat crop, and now you can go ahead, because I have been bothered with it long enough, and if you need any help, I will help you all I can;" that the delivery of possession and control over the place was absolute, and he was only to have the privilege of harvesting and threshing his wheat crop the following summer, and that he asked as an accommodation, (which was accorded,) permission to keep his hogs there until fattening time, and a heifer till the first of the year. It is quite probable that if the donee had remained unmarried, things would have gone on as at first. She would have continued to live in the house, and Mr. Gaither would have continued to cultivate and improve the farm,

but whatever may have been the original understanding between them as to his continued possession of the property, it was abandoned by him upon her marriage. He knew and approved of her contemplated marriage, and when it took place delivered possession to her and her husband. The weight of proof on this point is overwhelming, and the legal conclusion is irresistible, that this gift was fully and finally consummated during the lifetime of the donor. Nor is there anything to be found in the testimony of Mr. Gaither, when carefully examined, to warrant the conclusion that Mrs. Rabbitt was participant in this alleged fraud upon the rights of his wife. He admits upon cross-examination that he did not have any agreement with her that she should deed the property back to him whenever he wanted it, that he never said anything to her on that subject, and never told her that she was merely to hold the title and convey it back whenever he wished. Then upon re-examination by his own counsel, this question was put to him: "you have stated on cross-examination that you never said anything to Emily V. Cecil about re-conveying the Locust Grove farm to you, nor had any arrangement or understanding with her, by which said farm was to be re-conveyed, and yet you state you knew she would convey it to you if you asked her; how do you know it," and his answer was, "it was my opinion from the confidence I had in her; I mean that I *simply believed that she would do it.*" But his mere *belief* as to what she would do is by no means tantamount to an *agreement* on her part to do it, and this is what must be proved in order to make *her* a participant in the fraud. Her own conduct itself refutes this imputation. When the gift was perfected by delivery of possession on her marriage, she thereafter firmly asserted her rights as donee. She voluntarily joined her husband in filing the injunction bill, and resolutely and successfully resisted the effort of Mr. Gaither to enforce the note in

order to subject this property to its payment. Here, as in every other case, where fraud is charged or imputed, it must be made out by clear and satisfactory proof, and it is not the province of a Court to strain the evidence in order to establish it, even in aid of the favored claim for dower. Beyond doubt the evidence is insufficient to fasten the imputation of fraud in this transaction upon Mrs. Rabbitt, and in fact no such charge is made against her in the bill. What the bill charges is that the husband by this transaction intended to cheat and defraud his wife of her dower in this land, but the proof clearly shows that as between donor and donee the transaction was not colorable merely, nor a fiction, nor a sham, but a *bona fide* perfected and effectual gift.

The case then is one in which a husband has seen fit to make in his life-time an absolute donation to another of his equitable interest in land. He had the legal right to do this, even if his purpose was to defeat his wife's claim to dower; and having done it, the claim is defeated, unless the long-established construction of the Act of 1818, as well as settled rules and principles of evidence and law, are to be overturned and set at naught, for the purpose of giving the widow relief in this case. But this it is not competent for the Court to do, no matter what the apparent or supposed hardship of the particular case may be. It is for the Legislature, if it sees fit, to place equitable interests in land upon the same footing as regards the right of dower therein, as legal interests, but this it has not yet done, and it is clear that the Courts ought not to usurp legislative power. They can construe a statute, but having once clearly and definitely done so, and that construction having been acquiesced in and acted upon for more than forty years, it is for the Legislature to change the statute, rather than for the Courts now to change its construction, even if they should deem it erroneous. There can, however, be no reasonable doubt as to the

correctness of the construction placed upon this Act by our predecessors.

These are the views I entertain both as to the law and the facts of this case, and in my opinion so much of the decree as directs the commissioners to lay off and assign dower to the complainant in the Locust Grove Farm should be reversed, and in other respects affirmed.

In this result, however, a majority of my brothers who heard the case with me, do not concur, and I am instructed by them to say, that if it be conceded, (without, however, so deciding,) that it was necessary to prove that Mrs. Rabbitt participated in the fraudulent intent on the part of Mr. Gaither to defraud the appellee of her rights as his wife, they are of opinion that the evidence in the record shows that she had knowledge of such fraudulent intent at the time this farm was conveyed to her, and participated therein. They are therefore of opinion that the decree should be affirmed in its entirety, and it is accordingly so ordered.

*Decree affirmed, and*
*cause remanded.*

(Decided 16th March, 1887.)