EUGENIA L. KERNAN, By Her Next Friend,

*vs.*

SHIRLEY CARTER, et al.

*Husband and wife: personal property; power of husband to
alienate during his life; real estate, where wife a lunatic;
dower rights; waiver; renunciation of provision
in will; effect of wifes' lunacy. Corpora-
tions: purchase of property; payment
in stock. Code, Art. 23, sec. 35.
Equity: fraud; allega-
tions of—.*

Under section 13, Article 45 of the Code, a married man has
the power to convey real estate, without his wife's joinder,
where he acquires the real estate after she has been found, upon
an inquisition, to be a lunatic.                      p. 583

A man has the right to dispose of his personal property dur-
ing his life, even though it be done with an intent to defraud
his wife, provided he reserves for himself no interest therein.
                                                       p. 583

Where a man converted his real estate into a stock com-
pany, and then assigned the stock by deed of trust, the trans-
action is valid, even though his wife, a lunatic, was alive at
the time, especially in the absence of any fraudulent intent;
and, although the husband was a director or president of the
stock corporation so formed, with the controlling interest in
others, the transaction would not be *prima facie* void.   p. 584

Section 35 of Article 23 of the Code had for its object to
prevent a corporation from paying in stock an exorbitant price
for property; under it no attack can be successfully maintained
on account of the issuing of six hundred thousand dollars

($600,000) of preferred and common stock of the corporation for property which is admitted to be worth fourteen hundred thousand dollars ($1,400,000).                                        p. 585

Where a bill in equity alleges fraud, while it is not necessary to set out in the bill all the evidence of fraud of which the plaintiff has knowledge, yet there must be more than the plaintiff's conclusion as to the purpose and intent in the matter complained of.                                        p. 585

Chapter 325 of the Acts of 1916, relating to the property of a surviving widow, has no effect where the husband died before the passage of the Act.                                        p. 586

Under section 302 of Article 93 of the Code, a widow is barred of her right of dower unless she, within six months after the first grant of administration upon her husband's estate, shall deliver to the Court or Register of Wills where the administration has been granted a written renunciation in the form there given.                                        p. 588

This law applies even though the widow, upon inquisition, has been declared *non compos.*                                        p. 591

If renunciation for such a widow can be made at all through a court of equity, it must be made within the time fixed by the statute for making such renunciation.                                        p. 592

To grant or refuse leave to amend a bill in equity is in the discretion of the Court, and from its ruling no appeal will lie.                                        p. 594

*Decided April 4th, 1918.*

Appeal from Circuit Court No. 2 of Baltimore City. (DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Walter D. Eiseman* and *Isaac Lobe Straus,* for the appellant.

*Shirley Carter* and *Thomas Foley Hisky* (with whom were *Bernard Carter & Sons* on the brief), for the appellees.

Boyd, C. J., delivered the opinion of the Court.

This case is before us on an appeal from an order sustaining a demurrer to and dismissing an amended bill filed by the appellant, and on another appeal from an order refusing to grant the appellant leave to amend that amended bill. The plaintiff, Eugenia L. Kernan, is the widow of James L. Kernan, who died on the 14th of December, 1912, leaving surviving him his widow and two sons and a daughter. In 1887 the plaintiff was upon an inquisition adjudicated a lunatic upon the petition of her husband, who was appointed by the Circuit Court of Baltimore City the committee of her person and estate. The finding still remains in force and she is confined in Mount Hope Retreat, where she has been for many years. The bill alleges that for many years prior to and ever since the death of her husband she "has been and is *non compos mentis* and incapable of acting for and in her own behalf with respect to any business matters, property rights or interests whatsoever, and incapable and disabled at all times, both at and since the death of her said husband, from making any election with respect to accepting or renouncing the provisions made for her in his last will and testament" and that "she was and had been and is still disabled and incapacitated from taking any steps whatsoever, from instituting any proceedings, or causing any steps to be taken or proceedings to be instituted, to question or deny the validity of" a deed of trust, a deed of assignment or a deed of conveyance, which will be later referred to in this opinion. That paragraph of the bill concludes, "and that her disability and incapacity in all the respects, aforesaid, have been caused by the fact that she has been at all

times bereft of her reason and of all understanding of her rights, interests and matters aforesaid."

On the 20th of April, 1911, James L. Kernan executed a "deed of conveyance" to the James L. Kernan Company of Baltimore City, Incorporated, for a property which is therein described. The lot fronts partly on Howard street and partly on Franklin street, and is improved by a hotel and theatre. The property is described as being in fee simple, except a portion of it which is subject to an annual rent of $64.00. That deed also included personal property, the businesses, franchises, good will, etc. The consideration is stated to be 5,000 shares of preferred stock of the James L. Kernan Company, of the par value of $100.00 each, and 997 shares of the common stock of that company, of the same par value, all of which stock is said in the deed to have been issued and certificates thereof delivered to said Kernan, in accordance with a resolution of the stockholders duly passed at a meeting held in Baltimore on the 15th of April, 1911, in compliance with the provisions of section 35 of Article 23 of the Code. The deed also refers to a decree of the Circuit Court of Baltimore City, dated January 28th, 1887, being the proceeding in which the plaintiff was adjudicated a lunatic, and to section 13 of Article 45 of the Code, for the right of the grantor to sell and convey the real estate.

On the 20th of April, 1911, being the same day the deed of conveyance was made, a "deed of trust" was made by said Kernan, as party of the first part, to Frederick C. Schanberger and Shirley Carter, parties of the second part, in which it is recited, that, whereas the party of the first part had granted and assigned to the parties of the second part, upon the trusts therein set out, the 5,000 shares of preferred stock, and he was about to cause the same to be transferred to them on the books of the company, and desired to have the trust upon which they were granted and assigned fully set out in that instrument of writing, so that the same might be recorded, therefore, in consideration of the premises and

of the sum of $10.00, he granted, bargained and sold, assigned, transferred' and confirmed unto the parties of the second part, and the survivor of them, and the successors of the survivor of them, as therein provided for, the 5,000 shares of preferred stock in trust for the purposes therein set forth. They were to hold the said shares of stock, collect the dividends and income, and pay over the net dividends and income therefrom to the said Kernan during his life, and after his death to hold said shares for the following purposes: to collect and pay over the net dividends and income from 3,400 shares of that stock to the James Lawrence Kernan Hospital and Industrial School of Maryland for Crippled Children, during the joint lives of the trustees, and upon the death of either of them, the survivor to transfer and assign the said 3,400 shares to said hospital and industrial school. It was then provided that of the remaining 1,600 shares of preferred stock they were to hold 534 shares for each of his two sons and 532 shares for his daughter. The provisions of the trusts for each of them are set out at length, and under certain contingencies the share left to a son or daughter was to go to St. Agnes' Hospital.

On the 22nd of April, 1911, he made what is spoken of as a "deed of assignment," in which he stated that he had assigned to Frederick C. Schanberger 385 shares of the common stock of the James L. Kernan Company, absolutely, and to Shirley Carter 165 shares of said stock, absolutely, and to himself 447 shares for life, with remainder as to 315 of them to said Schanberger, and as to 132 shares to said Carter, and he desired to have said transactions evidenced by that deed so that it could be duly recorded. The deed then, in consideration of $5.00, assigned and transferred said stock according to what was stated in the preamble. All of the deeds were promptly put on record.

On the 24th of June, 1911, James L. Kernan executed his last will and testament, by which he gave to Bernard Carter and Shirley Carter, and to the survivor of them, $20,000 in trust to invest and reinvest the same from time to time, to

collect the income therefrom, and apply the net income, or so much thereof as shall be necessary, to the proper maintenance and support of his wife, for and during the term of her natural life, and from and after the death of his wife, and after the payment of her funeral expenses, to divide the corpus of said $20,000.00 and any accrued income therefrom, into two equal shares, and to pay one share absolutely to St. Agnes Hospital and the other to the Institute of Mission Helpers of Baltimore City, to be applied by it to the education and care of the deaf and dumb or otherwise afflicted children under its care. He then left $3,000 to each of his two sons, and said he did not make a bequest to his daughter because he had his life insured and held the policy for her benefit. He made the James L. Kernan Company of Baltimore City his residuary legatee and devisee. He appointed Messrs. Bernard Carter and Shirley Carter, and the survivor of them, executors of his will, which was probated on December 18th, 1912, and letters testamentary were granted to Shirley Carter, the survivor.

The bill asks the Court: (1) to renounce the provision made for the plaintiff in the will, and elect to take and receive, in lieu thereof, the share allowed her by law in the personal property of the estate, belonging to her husband at the time of his death; (2) to decree and declare that said Kernan died seized of all the real estate mentioned in the deed of conveyance of April 20th, 1911, and that she is entitled to dower therein; (3) that the three deeds be declared null and void, and that the plaintiff be declared and decreed to be entitled to one-third of the personal estate and her dower rights in all real property of which her husband died seized; (4) that the bequests and gifts in the residuary clause of the will be declared null and void; (5) that the executor be required to pay over to a trustee to be appointed her legal share, interest and portion of all the personal estate of which her husband died possessed; (6) that the Court direct such further proceedings as may be proper and necessary to assign the plaintiff her dower; (7) that there be an account-

ing with the defendants who have received profits, revenues, income or interest to which she was entitled, and (8) for general relief.

Section 13 of Article 45 provides that:

"Where any married man or married woman is a lunatic or insane, and has been so found upon inquisition, and the said finding remains in force, or where any married man or married woman has been absent or unheard of for seven years, the husband or wife of such lunatic or insane or absent person may grant and convey by his or her separate deed, whether the same be absolute or by way of lease or mortgage, as fully as if he or she were unmarried, any real estate which he or she may have acquired since the finding of such inquisition or since the beginning of such absence."

Mr. Kernan unquestionably had the power to convey the real estate included in the deed of conveyance of April 20, 1911, by virtue of that provision of the Code—having acquired it after the finding of the inquisition. There is no reservation whatever in the deed in his favor, but it was an absolute deed for a valuable consideration. Under the decisions in this State a husband can dispose of his personal property during his life, even if it be done with an intent to defraud his wife of any interest in it, provided he reserves no right to himself. *Hays* v. *Henry,* 1 Md. Ch. 337; *Dunnock* v. *Dunnock,* 3 Md. Ch. 140; *Rabbitt* v. *Gaither,* 67 Md. 94; *Brown* v. *Fidelity Trust Co.,* 126 Md. 175; *Poole* v. *Poole,* 129 Md. 387. There would seem to be no doubt that a husband has equal, if not more, power as to real estate, by virtue of that statute. It is said, however, on the part of the appellant, that by this transaction Mr. Kernan simply attempted to convert his real estate into stock of the corporation for the purpose of more readily depriving his wife of her interest by putting it in the shape of stock which could be easily transferred. That allegation seems to us to be contradicted by the exhibits filed with the bill and nothing is

alleged to overcome them, but the mere allegations of fraud without stating or suggesting that there is any evidence of it outside of the instruments themselves. The same day he received the certificates of stock he made the deed of trust, by which he transferred all of the preferred stock to the trustees for the trusts referred to above, and he assigned 550 shares of the common stock to Messrs. Schanberger and Carter, absolutely, in the proportions mentioned above, and 447 shares to himself for life, with remainder to those parties, absolutely, and did not reserve the right to assign or sell the interests of the remaindermen in the 447 shares. We will speak later of the transfer of the stock, but the deed of the real estate was in our judgment beyond the attack of the plaintiff, as it was an absolute sale without any reservation or control over that property. The controlling interest in the company was in the hands of others, and if he was a director, or even president, such a position would not give him the control of the property for his own benefit. His duty was to the company, and we find nothing in this bill and exhibits which would justify us in holding that he was not authorized to make the deed under the statute quoted.

We have not overlooked the point made by the appellant that section 35 of Article 23 of the Code was not complied with, but we think that has no merit. In the first place, the appellant could not object to that, if there is any irregularity about it. The object of the statute is to prevent a corporation from paying *in stock* an exorbitant price for the property —in short, from issuing watered stock. It would be impossible in many, perhaps most cases, to pay for stock in property if no one in any way interested in the person proposing to sell property for stock could take part as a stockholder. The statute says that "no stock shall be counted whose owner or holder is interested in *such services* or *property.*" Section 36 of Article 23 provides "that the valuation placed by the stockholders upon such services or property at the meeting duly warned, as aforesaid, and the propriety of their action

accepting the same and issuing the agreed number of shares therefor, shall in the absence of actual fraud be conclusive against and binding upon any and all creditors of the corporation." Surely the appellant is in no better position than creditors would be to raise any question about it. The "actual fraud" spoken of in the statute, means of course, the fraud in issuing the stock for services or property. If the bill is anything like correct in stating the value of the property conveyed for the stock to be worth about $1,400,000.00 no one interested in the corporation can complain of the stockholders who took part in that transaction giving 5,000 shares of preferred stock and 997 shares of common stock, each of the par value of $100.00—in all a par value of $599,-700.00.

The bill is replete with charges of fraud—based on the theory that all of these transactions were with the deliberate intent to defraud the unfortunate plaintiff of what the bill asserts were her marital rights. While it is not necessary to set out in the bill all the evidence a plaintiff may have knowledge of, there must be something more than the plaintiff's conclusion as to the purpose and intent of a party, in making written instruments brought before the Court, and the plaintiff calling them fraudulent or characterizing the plan as a scheme to perpetrate a fraud on a helpless lunatic does not make it so.

It would be difficult to find a record in which there are a bill in equity and exhibits, where the exhibits themselves, when given fair and unprejudiced consideration, meet so many of the allegations of fraud in the bill more clearly than those in this case do. There is no concealment—on the contrary there was an open book from beginning to end. Those exhibits do not in our opinion furnish ground for the charge of fraud that is made. In the first place, what possible motive could Mr. Kernan have had in defrauding his unfortunate wife of her rights in his property after his death? He must have been a very unusual and very peculiar man if,

in order to give one-half of his property to such a worthy charity as a hospital and industrial school for crippled children, he would purposely and intentionally go to work to defraud his insane wife. If anyone wanted to make provision for such charities and other objects, and had such an estate as he had—theatre and hotel properties—the reasonable and natural thing for him to do was just what Mr. Kernan did do. If the statement in the bill as to the value of the property is correct then the shares of stock he left to each of his children were worth considerably over $100,000.00, and he certainly had the right to say how much of his estate should go to each of them. He could not well have made suitable provisions for the crippled children without organizing a corporation, and probably could not have arranged for as much income out of the portion of his estate he wanted to give to that institution in any way other than the one he adopted. If he had simply made a will—directed a sale of his property and left such portion to the different persons and objects he had in view, it would have been next to impossible to have realized as much out of his properties as he could by the plan he adopted. Or if he had devised this property to trustees for the benefit of the Hospital for Crippled Children and others it could not have been done as well as by the plan he adopted. So far as the realty is concerned, we are not prepared to hold that even if a husband conveyed his real property and put it in the shape of stock or other personal property, partly because of the mental condition of his wife, and his knowledge of the fact that in case of his death before her his real estate would be encumbered by her dower in it, he could not do so under section 13 of Article 45 of the Code, and convey a good title, free and clear of her interest in the property, or in the language of the statute, "as fully as if he were unmarried." These papers were executed and Mr. Kernan died prior to the Act of 1916, Chapter 325, and hence there is no question as to its effect on his property. She could not have had more than a third interest for life

in the real estate, while in his personalty she would be entitled to the third absolutely. The consequences might be very serious in some cases where a husband or wife is a hopeless lunatic, if the other spouse could not sell the real estate and invest the proceeds in personal property, so as to avoid complications in regard to the real property. So, although there is nothing in any of the deeds, or in the will, to suggest that the plan worked out was adopted for the purpose of depriving the widow of any of her rights, even if Mr. Kernan was in any way influenced to pursue the course he did in order that the real estate should be free from his wife's dower, it was not, under the circumstances, fraudulent or prohibited—especially as the stock was placed in such shape that he could not dispose of it, and it could be readily reached by any one interested in the wife's welfare.

We will, therefore, determine what rights she had, if any, in the personal property left by the testator. It is only fair to say, that we cannot in considering this case merely compare the provision made by the testator (the income on $20,-000.00) with the large estate the bill alleges he left, as to simply state the figures is misleading. When these papers were executed Mrs. Kernan had been an adjudicated lunatic for twenty-four years. There is nothing in the bill to indicate that there was the least probability of her recovery, or decided improvement, although we are not told whether she is violent, or what her precise conditions is—beyond what we have stated above. While there is a suggestion in the bill that more might be used for her comfort and benefit than the income on $20,000.00, it is stated that the trustee only spends $10.00 a week for her maintenance and care. It is only fair to assume that the testator carefully considered what it had cost in the past and would likely cost in the future to provide for her. Mount Hope Retreat is an old and well-known institution for such persons. Cases before us in this Court and in the Circuits have given us information as to how it is conducted, the standing of physicians connected

with it, and the care given the patients by those in charge. The condition of this unfortunate lady may be such that the income from the sum placed in trust for her benefit may be more than ample, and apparently the trustee is of that opinion, as he says, according to the bill, less than three per cent. on the amount in trust. If more is necessary, and the trustees has it, we know of no reason why it could not be required to be paid.

Coming then to the question whether it is now too late to renounce the will, and whether the Court can renounce for her, an insane widow. By section 301 of Article 93 it is provided that: "Every devise of land or any estate therein, or bequest of personal estate to the wife of the testator shall be construed to be intended in bar of her dower in lands or share of the personal estate, respectively, unless it be otherwise expressed in the will." Section 302 is: "A widow shall be barred of her right of dower in land or share in the personal estate by any such devise or bequest, unless within six months after the first grant of administration upon her husband's estate she shall deliver or transmit to the Court or register of wills where administration has been granted a written renunciation in the following form, or to the following effect." The form provided then follows. This will was admitted to probate and letters issued December 18th, 1912, and the original bill was filed October 5th, 1916. It is clear that it was too late to file a renunciation of the bequest, unless there be some principle which enables a Court of Equity to act for one unable to act for herself at any time, regardless of the statute. It will be well to say here that we can see no force in the argument, much relied on by the appellant, that Mr. Kernan was the committee of his wife. There was no occasion to renounce until after the grant of administration upon his estate, and, of course, he was then dead, and was no longer a committee. What ought to have been done, if it was desired to file a renunciation, or test the right to file one, was to have a new committee appointed; or a bill

could have been filed by the next friend within the six
months, just as well as within three years and nine months
after the letters testamentary were issued. The deeds had
been on record for over nineteen months before the testator
died. This is not like a case in which a proceeding had not
been commenced earlier because of the insanity of the widow,
and she afterwards recovers and then seeks relief. She is
still insane, and probably will be until her death. There is
no valid excuse offered in the bill for not proceeding sooner.
Section 342 of Article 93 provides that, "No will, testament,
codicil or other testamentary paper shall be subject to caveat
*or other objection to its validity,* after the expiration of three
years from its probate," but notwithstanding that, this will
is attacked, in the name of Mrs. Kernan but by her son as
next friend, who could have done so as well within six months
as now. We can not be unmindful of the fact that if the
proceeding is successful the next friend, his brother, and the
children of his deceased sister are the real parties who would
profit by it, for unless the widow should recover, for which
it is not suggested there is any hope, whatever is recovered
in her name will eventually go to them. There is, therefore,
not only a delay for which no excuse is offered, but an at-
tack in the name of one who, so far as we can gather from
the bill, is not in such a mental condition as to be conscious
that her dead husband—the father of her next friend—is ac-
cused of perpetrating a fraud on her.

Whatever other Courts may have said, the case of *Collins*
v. *Carman,* 5 Md. 503, decided by our predecessors, is con-
clusive of the question, unless we overrule it. There an
insane widow to whom devises and bequests had been left by
her husband's will not to renounce as required by the stat-
ute. After her death her administrator filed in the Orphans'
Court a renunciation of the will, and then filed a bill in
equity for the purpose of obtaining a decree declaring the
renunciation effective and sufficient, or if for any cause it
should be deemed informal or imperfect the complainant
prayed that he might be considered as revoking, by his bill,

the renunciation. There, as here, the widow had received the benefits of the will for several years. The case was argued by some of the most distinguished attorneys who were ever at the Maryland bar—Thomas S. Alexander and William Schley for the appellant, and T. P. Scott and John V. L. McMahon for the appellee. The Court held that the administrator could not make the renunciation, or claim anything beyond what was given by the will. It said that it intimated no opinion on the question whether a Court of Equity could make an election or renunciation for an insane widow, during her life and in proper time. After quoting from the Act of 1798, Chapter 101, 1st and 2nd sections of sub-chapter 13, which are now sections 301 and 302 of Article 93, excepting there is a change in the time from ninety days to six months, the Court said: "*Every valid devise or bequest* is, therefore, made an effectual bar, unless it be removed by renunciation. And until that is made the bar remains. The law admits of no excuse for a failure to renounce. If she make no election within the time prescribed, the law makes it, without stopping to inquire why or for what reason she made none." JUDGE ECCLESTON then went on to show that the Act of 1798 had changed the common law, and that "when a man dies leaving a will, making *valid* gifts of real and personal estate to his wife, she has not, as she had at common law, a vested right to dower in his land, or to a legal share of his personalty, but her vested rights are under the will by virtue of the statute law."

He said: "And to effect the husband's object the wife need not declare her *assent;* if however, she desires to defeat it, she must manifest her intention to do so, by an express *dissent.* And such dissent is an act, which by the very terms of the law, must precede her becoming entitled to or vested with those rights which she might have claimed but for the will * * *. Whether from design, neglect, or from other cause, the widow fails to make such renunciation, the result is the same."

Again, it is said: "The language of the statute is quite comprehensive enough to include *every widow,* whatever may be her age, or mental condition, there being no exception in favor of infants or insane persons * * *. When the law directs an Act to be done, or a condition to be performed for the purpose of conferring a right, that right can not be acquired if the Act is left undone, or the condition is not performed. And if no exception is made in favor of insane persons. Courts of jutsice have no more power to decree to them the allowance of such rights, because of their mental incapacity to comply with the requisites of the law, than they have to decree in favor of sane persons failing to comply. If the law makes no exception the Courts can make none, whether they be Courts of law or equity; for where the construction of a statute is before them the rules of construction are the same in both Courts."

The Court referred to many cases, amongst others *Demarest* v. *Wynkoop,* 3 Johns. Chy. 142, where CHANCELLOR KENT considered at length the doctrine in regard to any inherent equity creating an exception as to any disability, where the statute of limitations creates none, and said the doctrine had been long and uniformly exploded. That case was approved in *Hertle et al.* v. *Schwartze et al.,* 3 Md. 383, and *Dugan* v. *Gittings,* 3 Gill, 161. JUDGE ECCLESTON added: "If these are the rules which apply to the statute of limitations, it is difficult to perceive why they should not be equally applicable to other statutes." The conclusion of the Court, as to whether the statute applied to an insane widow was: "With these principles before us, sanctioned by such authority, we can not but believe the present case is embraced within the broad and explicit language of the Act of 1798, and that without a renunciation, the widow had no right to dower, or to her common law share of the personalty."

The Court then considered the question whether the renunciation of the administrator availed anything, and held that it did not for several reasons. A number of cases were

cited to show that the administrator could not renounce, amongst others *Boone* v. *Boone,* 3 H. & McH. 95, where Stephen Boone died leaving a widow to whom he bequeathed a part of his personal estate. The widow died before the expiration of forty days (the time then fixed by the statute), and did not file a renunciation. It was held that her representatives did not have the privilege of renouncing the bequest "being intended entirely for her benefit and personal privilege."

Although it was urged by the learned attorneys for the appellant that that case does not apply, we are unable to concur with them. The principles there announced have never before been questioned in this State, and while in individual cases some hardships may result, it would be vastly more disastrous, if settlements of estates are to be kept in uncertainty for years, probably throughout the lives of insane widows, and husbands, under the present law, by the contrary view. As that case expressly left open the question whether a Court of equity can make the election, or renunciation, "during her life *and in proper time,*" which manifestly means within the time fixed by the statute, it does not preclude an application to a Court of equity within that time, and as this bill was filed over three years beyond that time, it would be useless to discuss that, further than to say that if it can be done at all by a Court of equity it must be within the time fixed by the statute certainly where, as here, every one of the near relatives was a beneficiary under the will, and knew, or must under the circumstances be treated as knowing, everything which was necessary to enable proceedings to be taken. That was the view taken in the dissenting opinion filed in *Wright* v. *West,* 2 Lea ('70 Tenn.), 78, a case relied on by appellant, which seems to us to be the safest and proper rule, if a Court of equity can elect or renounce for an insane widow. We have the right to assume that the next friend and other relations took under this very will as we are not told in the bill that they did not, and this

next friend not only accepted the will himself, but permitted the trustee to provide for his mother under it, and made no move in Court until nearly four years after his father's death. He would be effectually barred if he attempted to attack the will, and would not be heard in a Court of equity, by reason of his laches, to attack the other instruments, unless there was some ground other than what is in this bill, yet it is contended that he can in the name of his insane mother accomplish indirectly, what he could not do in his own name. It is far better that there be some risk of an occasional injustice to an insane widow, as much as that is to be regretted, than that a Court of equity be in the position of being required to grant relief *indirectly* to one who would have no standing in Court, if he asked relief in his own name. We are not told how many, if any, crippled children have been receiving help from the 3,400 shares of preferred stock, although probably some were during the years between the death of Mr. Kernan and the filing of the original bill, but if there are any, and the prayers of the bill must be granted, it may well be that if this unfortunate plaintiff could have her reason restored sufficiently to take in the situation, she might deeply regret this proceeding.

In the case of *Garrison* v. *Hill,* 81 Md. 551, what is now section 342 of Article 93, above quoted, was involved. One of the reasons for contending that the statute was invalid was that there was no saving clause to those under disability to sue. We said in reference to that: "So far as the omission to insert a saving clause in favor of those under disability to sue is concerned, it might be said the appellant is not in a position to complain. She is now in this Court by her next friend, and could have so proceeded at any time since the will of Mrs. Johnson was probated. But the law can not be said to be unconstitutional merely because it fails to extend the time in favor of those under disability, such as coverture, infancy, etc. It is discretionary with the Legislature whether or not they shall be exempted from the oper-

ation of the statute of limitations, and unless that statute does not so exempt them they are governed by the same law that others are."

As this opinion is already of unusual length, we will not cite other cases on the subject except to refer to *Collier* v. *Smaltz,* 149 Iowa, 230, 128 N. W. 396, which is also reported in Ann. Cas. 1912, C. 1007, where there is a note citing a great many cases. That note begins with the statement that "There is no dissent from the proposition announced in the reported case that where a statement of limitations contains no exception in favor of persons *non compos mentis,* the statute runs against an insane person." As we are of the opinion that *Collins* v. *Carman, supra,* is applicable, and we are not willing to overrule it, but on the contrary believe that it announced the correct rule under such statutes as we have, it would be useless to discuss the authorities to the contrary cited by the appellant.

It is only necessary to say in reference to the refusal of the lower Court to allow the plaintiff to again amend the bill, that it was in the discretion of that Court and there is no appeal from it. *Miller's Eq. Proc.,* 231, Sec. 182. The Court doubtless thought that amendment could make no difference in its conclusion. The appeal from the order refusing to give leave to amend will be dismissed, and the order sustaining the demurrer and dismissing the bill will be affirmed.

> *Appeal from the order refusing leave to amend dismissed. Order sustaining the demurrer and dismissing the bill affirmed, the next friend to pay the costs.*