WINTERS *v.* PIERSON, Surviving Executor Of
The Estate Of George E. Winters, ET AL.

[No. 341, September Term, 1968.]

*Decided July 8, 1969.*

The cause was heard before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*David Freishtat* for appellant.

*Edward Pierson,* with whom were *Leon H. A. Pierson* and *Pierson and Pierson* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

The appellant, Jean R. Winters (Jean), is the widow of Charles W. Winters (Charles), who died domiciled in Baltimore on 2 August 1963. Dissatisfied with the manner in which she had been treated in the distribution of her husband's estate, Jean sought equitable relief in the Circuit Court of Baltimore City. Jean's bill of complaint, filed against George E. Winters (George), who was Charles' son and her stepson, individually and as executor of Charles' will, and George's wife, Dorothy M. Winters (Dorothy), alleged that she had married Charles on 4 February 1959; that by a will dated 1 September 1962, Charles had bequeathed to her his household goods and furniture and one-third of the residue of his estate, and that the balance of the estate had been left to George; and that "since the marriage of * * * [Charles] to * * * [Jean] in 1959, and until his death on August 2, 1963, [Charles] has entered upon a systemized scheme of fraudulently disposing of his assets through his son, George E. Winters, and his daughter-in-law, Dorothy M. Winters, so as to create a fraud on the marital right of [Jean] * * *."

The bill of complaint prayed, *inter alia,* that George and Dorothy be ordered to account to Jean; that they be enjoined from disposing of assets received from Charles subsequent to February, 1959; that the assets so received be impressed with a constructive trust; and that the court assume jurisdiction over the administration of Charles' estate.

After a protracted hearing the court entered a decree directing, in part, that the sum of $16,034.03 be paid to Jean from the assets of Charles' estate, this amount representing the balances in two bank accounts in the joint names of Charles and Jean which had been withdrawn by Charles about a month before his death.

Both sides entered appeals from this part of the decree: Jean, because she deemed the relief inadequate; George, because he regarded it as unwarranted. After trial, but before the case was decided below, both George and Dorothy died. The appellees and cross appellants are Leon H. A. Pierson, as surviving executor of George's will, and Charles C. Winters, as administrator d.b.n. c.t.a. of Charles' estate. We propose to affirm the decree.

Charles was 78 when he died in 1963. He had been married four times. George, who was 57 at the time of his father's death, was a son of the first marriage, and Charles' only surviving child. Another son of the first marriage had died in childhood, without descendants.

Jean was about 58 when Charles died, had lived with him since 1941 ostensibly as his wife, although they had not been married until 4 February 1959. In August of 1950, they had purchased their residence at 1716 Windemere Avenue, as "tenants by the entirety." Title to the house passed to Jean on Charles' death.

George testified that his father was a licensed master electrician, who had been successfully engaged in the sale and installation of Delco and Westinghouse rural electric systems until sometime in the 1930's and had been active later in the purchase and sale of real estate, first for his own account, and later, jointly with George. In 1948, Charles formed Winters Distributing Company, Inc. (the Company), which took over a franchise for the sale and operation of coin-operated phonographs, manufactured by the Wurlitzer Company. George, called as an adverse witness by Jean, insisted that the Company never made money, and in some years, sustained substantial losses. The Company's charter had been forfeited in 1959, and the chancellor found that it had thereafter been operated by Charles as sole proprietor. By 1960, accumulated operating losses amounted to some $32,900.

The evidence made it clear that Charles was in the habit of financing the bulk of the Company's sales for his own, and not for the Company's account; and while Jean

makes a point of this, it is relevant only to the extent that the profits from the undertaking seem never to have been recognized by Charles.

George, himself an electrician, testified that he had been in the clothing business, had been a part owner of a restaurant and had owned a chain of dry cleaning establishments, all for brief periods of time before joining his father in the Company. He said that his only income since 1948 had been a weekly salary of $62 paid him by the Company.

Jean Winters was able to show that while the gross assets of Charles' estate subject to probate in the orphans' court amounted to about $79,000, Charles had opened, according to Jean, some 26 joint savings or checking accounts with balances totalling more than $100,000, most of which were subject to withdrawal only by Charles, and some, by Charles or George. Eight of these accounts had been opened on 18 March 1953, and the others at later dates between 1955 and 1958. Only three of the accounts had been opened subsequent to Charles' marriage in 1959, and these were in the joint names of Charles and George and subject to the order of either. In 1963, balances in these three accounts aggregated less than $15,000. Of the entire group of accounts, four had been set up with George's three children as joint owners; two had been set up for each of four of George's grandchildren; one, for George's wife, Dorothy; and the others, save one, were in the joint names of Charles and George.

Jean also challenged the validity of two purchases of real estate by George involving some $32,500, one made in 1949, the other, in 1960; of a mortgage loan of $27,000 made in 1958, and of savings bonds held jointly by Charles and George having a value of $4,600. George's testimony that the real estate had been acquired and the loan made from his own funds was not contradicted, and the chancellor so found.

The thrust of Jean's bill of complaint was that all of these transactions amounted to a scheme to deprive her

of her marital rights. As the evidence developed, there was a change in emphasis, however, and it was argued in Jean's behalf below and before us that (i) the joint accounts with George, the real estate purchases and the mortgage loan represented Charles' and not George's money; (ii) Charles lacked the legal intent to create the joint accounts; (iii) the joint accounts were illusory and against public policy; and (iv) the joint accounts were testamentary dispositions, violative of the statute of wills.

If any conclusion can be drawn from our prior decisions, it is that questions like those here presented must be resolved on a case-by-case basis. As our predecessors said in *Collins v. Collins*, 98 Md. 473, 57 A. 597 (1904) :

> "Nothing that we have said, however, is to be understood as going beyond the case before us or as laying down the rule more broadly than to protect the widow against a voluntary conveyance by the husband of *all* his estate, made on the eve of his marriage without her knowledge and with the intent of defeating her marital right. In cases where * * * [the] conveyance embraces only a part of the husband's estate, or where provision is made out of his estate for children of a former marriage, the questions thus presented are left open for future consideration as they may arise." 98 Md. at 484

Again, in *Mushaw v. Mushaw*, 183 Md. 511, 39 A. 2d 465 (1944), Judge (later Chief Judge) Henderson, speaking for this Court, said:

> "The question to be determined is, therefore, whether the use of the [joint account] was fraudulent in the case at bar. The salient fact is that the widow is completely stripped of her marital rights in the personal property of her husband. This may be a matter of degree but it appears to be the only basis on which the decisions can be reconciled." 183 Md. at 517

*See also, Jaworski v. Wisniewski,* 149 Md. 109, 131 A. 40 (1925), "where the avowed purpose was to transfer property so that the spouse would get nothing"; *Newman v. Dore,* 275 N. Y. 371, 9 N.E.2d 966, 112 A.L.R. 643 (1937); *Macy v. Williams,* 83 Hun. (90 S. Ct. Rptr.) 243 (N. Y. 1894), *aff'd* 144 N. Y. 701 (1895), relied on by Jean; Sykes, *Inter Vivos Transfers in Violation of the Rights of Surviving Spouses,* 10 Md. L. Rev. 1 (1949); 1 Scott, *Trusts* § 58.5 (1967) at 542-49.

On the one hand, we find a broad-brush treatment in some of our cases:

> "It is settled law in this State that a husband may alienate his property at will, even though in the exercise of this right he strips himself of all means of supporting or maintaining his wife, provided he does so *bona fide* and with no design of defrauding her of her just claims upon him and his estate. *Ricketts v. Ricketts,* 4 Gill, 105 [1846]; *Feigley v. Feigley,* 7 Md. 561 [61 Am. Dec. 375 (1855)]." *Stewart v. Stewart,* 105 Md. 297, 303, 66 A. 16 (1907). *See also, Oles Envelope Corp. v. Oles,* 193 Md. 79, 88, 65 A. 2d 899 (1949); *Mushaw v. Mushaw, supra,* 183 Md. at 519; *Sanborn v. Lang,* 41 Md. 107, 114 (1874),

or,

> "* * * Under the decisions in this State, a husband can dispose of his personal property during his life, even if it be done with an intent to defraud his wife of any interest in it, provided he reserves no right to himself." *Kernan v. Carter,* 132 Md. 577, 583, 104 A. 530 (1918). To the same effect, *Poole v. Poole,* 129 Md. 387, 99 A. 551 (1916).

On the other hand, we find such sweeping statements narrowed by a consideration of the facts at hand.[1] In *Al-*

---

1. *See, for example, Klosiewski v. Slovan Bldg. & Loan Ass'n,*

*lender v. Allender,* 199 Md. 541, 87 A. 2d 608 (1952), Note, 14 Md. L. Rev. 350 (1954) our predecessors, alluding to the "matter of degree" referred to by Judge Henderson in *Mushaw v. Mushaw, supra,* 183 Md. at 517, said: "This may be a matter of degree, but it appears to be the only basis upon which the cases can be reconciled" and continued:

"* * * It must be admitted, however, that the test of degree does not commend itself as a legal criterion. If the wife receives less than her legal share in the personal estate, it would seem to be quite immaterial that she is not wholly cut off, that she receives her dower rights in the real estate, or that she has resources of her own. On the other hand, as suggested in the *Mushaw* case, courts of equity have always inquired into the fairness, under all the circumstances, of transactions between persons in a confidential relation.

"The doctrine of fraud on marital rights represents an effort to balance the social and practical undesirability of restricting the free alienation of personal property against the desire to protect the legal share of a spouse. It has always been recognized that a husband, in the absence of statutory regulation like that in the case of dower, has an unqualified right to give away his personal property during his lifetime, even though the effect is to deprive the wife of her statutory share. But if the gift is not absolute and unconditional and the donor retains do-

247 Md. 82, 230 A. 2d 285 (1967); *Gianakos v. Magiros,* 234 Md. 14, 197 A. 2d 897 (1964); *Whittington v. Whittington,* 205 Md. 1, 106 A. 2d 72 (1954); *Bullen v. Safe Deposit & Trust Co.,* 177 Md. 271, 9 A. 2d 581 (1939); *Whitehill v. Thiess,* 161 Md. 657, 158 A. 347, 79 A.L.R. 373 (1932); *Sturgis v. Citizens Nat'l Bank,* 152 Md. 654, 137 A. 378 (1927); *Brown v. Fidelity Trust Co.,* 126 Md. 175, 94 A. 523 (1915); *Rabbitt v. Gaither,* 67 Md. 94, 8 A. 744 (1887); *Dunnock v. Dunnock,* 3 Md. Ch. 140 (1852); *Hays v. Henry,* 1 Md. Ch. 337 (1848).

minion and control over the property during his lifetime, the courts have held that the gift is colorable and may be set aside." *Allender v. Allender, supra,* 199 Md. at 549-50.

Chief Judge Brune, speaking for the Court in *Whittington v. Whittington,* 205 Md. 1, 106 A. 2d 72 (1954), suggests the tests to be applied to specific situations:

"In Maryland, the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent spouse have all been considered material, and no one test has been adopted to the exclusion of all other tests. * * * [T]here are several other factors which have been or may be considered as pertinent, such as the relative moral claims of the surviving spouse and of the transferees, other provisions for the surviving spouse, whether or not he or she has independent means and the interval of time between the transfer and the death of the transferor." 205 Md. at 12

In a nutshell, all of the tests are germane, but no one of them is conclusive in any case. Applying them to the facts before us it would appear that Charles retained sole control over only some of the accounts, primarily those for grandchildren and great-grandchildren; did not strip himself of all of his assets; made substantial provision for Jean; and made the bulk of the transfers before his marriage was even contemplated, some six years before his marriage and 10 years before his death.

The really significant factor in the Winters picture is the result. While the parties naturally disagree as to arithmetical niceties, it is safe to say that Jean, under the will, the chancellor's decree, and as surviving tenant

by the entirety, has benefited or will benefit to the extent of some $50,000. George, assuming for this purpose only, that all the funds in the accounts which he held jointly with his father were his father's and not his, will receive or has received from the estate and the joint accounts about $100,000, subject, however, to the payment of federal estate taxes estimated at some $16,000. Since Jean herself neither seriously questioned the propriety of approximately $40,000 placed in the joint names of Charles and his grandchildren and great-grandchildren, except, as she says in her brief "to determine monies accumulated * * * as well as controlled by Charles", nor was able to controvert George's testimony that the real estate purchased for $32,500 and the mortgage loan of $27,000 represented his own funds, the benefits which she will receive are in an amount substantially equivalent to the statutory share to which she would have been entitled as a surviving widow, had there been included in Charles' probated estate the accounts in the joint names of Charles and George.

As we see it, except for the two accounts awarded her by the chancellor, Jean utterly failed to meet the burden of proof. Jean would have us make much of the fact that Charles was attempting to evade income taxes, and that his intention was vitiated by his illegal purpose, relying on *Hancock v. Savings Bank of Balto.*, 199 Md. 163, 85 A. 2d 770 (1952). This, however, is no more than a suspicion which she has failed to clothe in substance. There is every reason to conclude that Charles' motives in setting up accounts for his grandchildren and great-grandchildren were not only understandable but legitimate. Jean called George as her witness, and finds herself in the uncomfortable position of being bound by his testimony that the real estate purchases, the mortgage loan, and at least a substantial portion of the funds in the joint accounts which he had with his father, represented funds which George had inherited from his mother. *P. Flanigan & Sons, Inc. v. Childs*, 251 Md. 646, 652, 248 A. 2d 473 (1968) and cases there cited.

The situation with respect to the sum of $16,034.03, allowed Jean by the chancellor's decree is somewhat different, however. This represents the balance in two savings accounts, one opened in Provident Savings Bank on 18 March 1953, the other opened on 16 August 1955 in the name of "Charles W. Winters in trust for self and Jean R. Winters, subject to the order of Charles W. Winters, balance on death to belong to the survivor." There was evidence from which the court could conclude that the relationship between Charles and Jean, never an entirely felicitous one, took a new turn toward further deterioration in April or May of 1963, when Jean consulted counsel. Charles stayed with George from 13 May until 30 July, and then returned to the hospital. On 29 July, Charles had been served with process in an action for separate maintenance brought by Jean, but Charles must have known that his counsel was meeting with Jean's counsel as early as April of 1963.

In early July, Charles withdrew the funds on deposit and closed the accounts. $16,034.03, the amount of the withdrawal, was placed in an envelope marked "Jean" in Charles' safe deposit box, and was subsequently returned as an asset of Charles' estate. The chancellor found, and we think correctly, that the closing of the accounts wrongfully deprived Jean of funds to which she was legally entitled, and the decree which we shall affirm directed that these funds be returned to her. *See Levin v. Levin,* 166 Md. 451, 171 A. 77 (1934) ; Maryland Code (1957, 1965 Repl. Vol.) Art. 39B § 7; 27 Eliz. Cap. 4, 2 Alexander's Brit. Stat. (Coe Ed. 1912) 555.

Jean would have us recognize that from 1948 on, there is no evidence that the Company provided much of a livelihood for Charles and George, and that there is something very suspicious about the funds which they had accumulated. The difficulty here is that one who alleges fraud must prove it, *Kline v. Inland Rubber Corp.,* 194 Md. 122, 69 A. 2d 774 (1949), and this Jean failed to do. Further, Jean's efforts to impose on George the ex-

planation which might be required of one occupying a confidential relationship died aborning, for the record makes it abundantly clear that George was completely dominated by Charles, and not Charles by George. *See Owings v. Owings,* 233 Md. 357, 196 A. 2d 908 (1964) ; *Blair v. Haas,* 215 Md. 105, 137 A. 2d 145 (1957) ; *Tribull v. Tribull,* 208 Md. 490, 119 A. 2d 399 (1956) ; *Whittington v. Whittington, supra,* 205 Md. 1, 13; *Meley v. DeCoursey,* 204 Md. 648, 106 A. 2d 65 (1954).

As we see it, Jean cannot complain of the failure of her attempt to make legal bricks without evidential straw: hers was the burden of proving that she had been fraudulently deprived of her rights, and she simply failed to meet the burden.

*Decree affirmed; costs to be paid by appellant.*