THE METHODIST EPISCOPAL CHURCH OF EMORY CHAPEL OF ELLICOTTS MILLS IN ANNE ARUNDEL COUNTY ALSO KNOWN AS EMORY UNITED METHODIST CHURCH v. MAY STARR HADFIELD

[No. 1733, September Term, 1981.]

*Decided December 6, 1982.*

The cause was argued before Moylan and Moore, JJ., and Morris Turk, Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Robert E. Scher,* with whom were *Timothy E. Welsh* and *Theodore J. Potthast, Jr.,* on the brief, for appellant.

*Bernard F. Goldberg* for appellee.

Moore, J., delivered the opinion of the Court.

May Starr Hadfield, appellee, individually and as personal representative of her deceased husband's estate,[1] filed a bill of complaint against the Methodist Episcopal Church of Emory Chapel, appellant, to set aside a fraudulent conveyance. Her complaint stated, *inter alia,* that she was unable to include the marital residence in the estate because her husband had conveyed the home to appellant to defraud her of her marital rights. The case was heard on July 16, 1981. The Circuit Court for Howard County (Gilmore, J.) entered a judgment in favor of appellee with an order nullifying the deed to appellant and ordering the property to

---

1. Robert Webster Minns Hadfield died intestate.

devolve into the estate to be distributed pursuant to the laws of intestate succession. For the reasons stated we shall remand the case for further determination by the trial court without affirmance or reversal.

## I

Robert Webster Minns Hadfield and May Starr Hadfield were married on September 16, 1972. They lived in a house known as "Cheriton" in Howard County, Maryland, which he had inherited from his first wife, Elizabeth Cavey Hadfield (Mrs. Cavey), and which was titled in his name alone. Mr. Hadfield was an engineer who had retired from Westinghouse Corporation. Mrs. Hadfield had worked outside the home for 22 years but quit when she married and assumed the duties of a housewife. In late 1974, she was advised by a doctor to seek part-time employment as therapy for her nerves and an angina condition. She found temporary work as a hostess at a restaurant in mid-1975.

Later that year, her husband discovered that she had withdrawn $10,000 from a joint account and put it into a separate account in her name alone. Angered by this transaction, her husband called her a "robber" and a "thief." [2] Mrs. Hadfield testified at trial that the $10,000 account had been opened in both their names before they were married. She withdrew the money after her husband started charging her 14 cents a mile to go to and from work. Apparently, he was unhappy that she was employed outside the home. About this time, Mr. Hadfield, without his wife's knowledge, signed a deed conveying a remainder interest in their home to the Church, reserving for himself a life estate

2. In its brief, appellant termed the Hadfields' marriage "a disaster." While the couple's marital difficulties were the subject of some testimony at trial, the chancellor stated in his memorandum order: "The evidence as to how well the Decedent and the Widow got along during their marriage is conflicting; however, resolution of this evidentiary conflict is not material to the resolution of the instant controversy." Mrs. Hadfield testified at trial that she sold her car at Mr. Hadfield's insistence when she married. After she started work, she said, Mr. Hadfield let her use the family car but charged her mileage. On occasion he would take her to work but neglect to pick her up. Subsequently, Mrs. Hadfield bought a car for her own use.

with full powers "to sell, mortgage, or otherwise dispose" of the property within his lifetime,[3] without the joinder of the Church. Mr. Hadfield and his first wife, Mrs. Cavey, were members of the Church and had supported it "generously." In 1976 Mr. Hadfield became seriously ill with cancer and underwent a major operation. Mrs. Hadfield "nursed him back to health." Subsequently, she found full-time work as a deputy clerk for the Howard County Circuit Court. Following a second heart attack, Mr. Hadfield died, intestate, on January 13, 1980. A cancelled will, various insurance policies, and government bonds were found in his safe deposit box.

Mrs. Hadfield, who was appointed personal representative, received a letter from the Church ten days after her husband's death expressing sympathy and seeking a meeting to discuss when she planned to vacate the house.[4] She responded by filing, individually and as personal representative, a bill of complaint "to set aside a fraudulent conveyance." Her complaint stated, *inter alia,* that as personal representative, she was unable to include the mari-

---

3. The deed recites that the two portions of the property were inherited by Isabel B. Cavey and her husband, Elmer C. Cavey, on April 11, 1927, as tenants by the entireties. When he died, she inherited the property, and later married Robert W. M. Hadfield. On July 16, 1967, she died, leaving the property in her will to Mr. Hadfield. By that same will, the Church received almost $25,000, counsel for appellee informed the court in closing argument. He added that if Mrs. Cavey, the first Mrs. Hadfield, had wanted the house to go to the Church, as counsel for the Church maintained, she could have willed it to the Church, providing Mr. Hadfield with a life estate. It is clear that Mr. Hadfield had no ownership in the property until his first wife died. Her will left the property to a cousin if he predeceased her.

4. We reproduce the letter in full:

"January 22, 1980

Mrs. Robert Hadfield
3966 Columbia Road
Ellicott City, MD   21043

Dear Mrs. Hadfield:
Needless to say, the members of Emory United Methodist Church were saddened to hear of your husband's death and by this letter express their sincere sympathy to you.
As you know, Mr. Hadfield, on October 1, 1975, conveyed his home to Emory United Methodist Church, subject to a life estate with full powers, and which upon his death reverts to the remainderman. Therefore, Emory's

tal residence in the estate because of the demands of the Church, that the purported conveyance was without consideration, that it was fraudulent because its purpose was to defraud the wife of her marital rights in the estate, and that the deed was an attempt to make a testamentary disposition without compliance with the pertinent laws of Maryland and was, therefore, invalid. Mrs. Hadfield asked that the deed be declared null and void, and cancelled, and that the estate of Mr. Hadfield be declared the owner in fee simple of the property known as 3966 Columbia Road.

After a hearing on July 16, 1981, both sides filed comprehensive legal memoranda. Judgment for appellee was entered on December 3, 1981. Judge Gilmore found that the transfer of the property to the Church was without consideration [5] and defrauded the wife in that Mr. Hadfield did not relinquish full control. The judge declared the deed null and void, set aside the conveyance, and held that the statutory provisions pertaining to a surviving spouse's right to elective share did not apply because Mr. Hadfield had died *intestate*. Thus, the house became part of the estate to be distributed to the wife.

Appellant challenges the decision of the circuit court on two grounds. First, the Church argues that the court erred in considering only the factor of lifetime control of the property in determining whether the *inter vivos* conveyance

---

Board of Trustees would like to meet with you at a mutually convenient time to discuss plans for physical possession of the property.

Very sincerely yours,

BOARD OF TRUSTEES<br>EMORY UNITED METHODIST CHURCH<br>/s/ Virginia B. Peddicord<br>By: Virginia B. Peddicord<br>Secretary-Treasurer."

**5.** The deed recited "in consideration of the sum of Five Dollars ($5.00), and other good and valuable considerations, .. " but the attorney who prepared the deed testified that it was a form deed, without stamps, and the $5 had never been paid. The lower court ruled that "in reality the transaction was not supported by any consideration." Even so, lack of consideration alone will not nullify a deed. Gadekar v. Phillips, 36 Md. App. 715, 725-6, 375 A.2d 248, 255 (1977), *cert. denied*, 281 Md. 737 (1978). The property was later sold by the wife for $130,000.

defrauded appellee of her marital rights. Second, assuming *arguendo* that the court correctly held that the property devolved into the estate, appellant suggests that appellee's share should be determined by the laws of testate rather than intestate succession even though Mr. Hadfield departed without a will.[6]

## II

The heart of appellant's argument is that the chancellor failed to consider all the factors outlined in the leading cases of *Whittington v. Whittington,* 205 Md. 1, 106 A.2d 72 (1953), relying instead on the single ground that Mr. Hadfield's failure to convey the house to the Church absolutely and unconditionally constituted a fraud on the widow's marital rights. *See Grove v. Frame,* 285 Md. 691, 402 A.2d 892 (1979).

The *"Whittington* factors" were suggested by a distinguished local commentator, Melvin Sykes, Esq. in *"Inter Vivos Transfers in Violation of the Rights of Surviving Spouses."* 10 Md.L.Rev. 1 (1949). In *Whittington,* the trial judge's finding that four jointly-owned savings account trusts in favor of the decedent's two sons were valid, was affirmed by the Court of Appeals in an opinion by Chief Judge Brune which pointed out that no evidence of any fraud had been suggested. The Court then addressed the "ultimate question" whether the establishment of these *valid* trusts constituted a fraud upon the marital rights of the decedent's surviving spouse. After discussing the earlier case of *Mushaw v. Mushaw,* 183 Md. 511, 39 A.2d 465 (1944), and

---

**6.** This second proposition is premised upon the assumption that because appellee relied on the fraud perpetuated against her marital rights to invalidate the transfer, she is forced to take only a one-half share of the estate under the will election statute. Md. Est. & Trusts Code Ann. § 3-203 (b) (1981 Cum.Supp.). Appellant suggests that § 3-203 is an exclusive legislative pronouncement affording protection to a surviving spouse defrauded of his or her marital rights and, therefore, the only basis upon which appellee can seek redress. The court below, however, applied the intestate succession statute which entitled appellee, as sole surviving heir, to the entire estate. Md. Est. & Trusts Code Ann. § 3-102 (e) (1974).

*Allender v. Allender,* 199 Md. 541, 87 A.2d 608 (1952), the Court quoted the following from *Allender:*

> "The doctrine of fraud on marital rights represents an effort to balance the social and practical undesirability of restricting the free alienation of personal property against the desire to protect the legal share of a spouse. It has always been recognized that a husband, in the absence of statutory regulation like that in the case of dower, has an unqualified right to give away his personal property during his lifetime, even though the effect is to deprive the wife of her statutory share. *But if the gift is not absolute and unconditional and the donor retains dominion and control over the property during his lifetime, the courts have held that the gift is colorable and may be set aside.*" (Emphasis added.)

*Whittington, supra* at 11, 106 A.2d at 77 *(quoting Allender, supra* at 550, 87 A.2d at 611). The Court in *Whittington* then turned to the factors which may be considered as material and pertinent in determining whether a particular *inter vivos* transfer constitutes a fraud upon the marital rights of a surviving spouse. The Court explained:

> "In Maryland, *the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent spouse have all been considered material, and no one test has been adopted to the exclusion of all other tests. . . .* [T]here are several other factors which *have been or may be considered as pertinent,* such as the relative moral claims of the surviving spouse and of the transferees, other provisions for the surviving spouse, whether or not he or she has independent means and the interval of time between the transfer and the death of the transferor." (Emphasis added.)

*Whittington, supra* at 12, 105 A.2d at 77.

It is apparent from the emphasized language that the *Whittington* Court was merely suggesting the factors that have been considered and those that may be considered. The case does not hold that all these factors must be evaluated; indeed, the opinion stressed that no single test has been adopted. *Id.* at 14, 105 A.2d at 78.

Nor does *Whittington* impinge upon the two-stage analysis to be employed in a case involving fraud upon marital rights.

The first step is not a consideration of any of the pertinent factors, but rather, an examination of the transfer itself to determine whether it is valid and effective or merely colorable and illusory. *See, e.g., Gianakos v. Magiros,* 234 Md. 14, 197 A.2d 897 (1964). Therefore, the *threshold question* is whether the decedent retained some measure of control over the property he attempted to convey. If no control is retained, there can be no fraud. *Grove, supra* at 698, 402 A.2d at 896 (husband's absolute conveyance of residence to exclude wife from inheritance held not fraudulent).

Even if control is retained, the transfer can be technically valid. *See Gianakos, supra.* The court then must decide whether the transfer should be set aside as a fraud upon the surviving spouse's marital rights. It is at this second stage of the analysis that the *Whittington* factors aid in this determination.

Both *Whittington* and *Grove* reaffirmed the underlying principles found in *Rabbitt v. Gaither,* 67 Md. 94, 8 A. 744 (1887). A husband has the right to convey his property without the assent or knowledge of his wife, and an absolute, unconditional transfer is valid even if the husband intends to deprive his wife of her share; however, if the transfer is a mere contrivance by which the husband retains control over the property during his life to defeat any claim of his widow at death, the law pronounces such a transfer a fraud upon her rights; and the fraud may be proved by his retention of possession and reservation of an interest. *Id. See also Allender, supra* at 546, 87 A.2d at 611. The *"Whittington*

factors" are ancillary to the basic principles. As the Court of Appeals remarked in *Winters v. Pierson,* 254 Md. 576, 255 A.2d 22 (1969), after reviewing pertinent case law, "In a nutshell, all of the tests are germane, but no one of them is conclusive in any case." *Id.* at 584, 255 A.2d at 26.

It is apparent that the chancellor below misread *Grove* to mean that a surviving spouse need show only that an *inter vivos* transfer was not absolute and unconditional to avoid the transfer. The relevant portion of Judge Cole's opinion in *Grove* reads:

> "Prior to 1970, the test to determine whether there had been a fraud on a widow's marital rights applied to personalty only because the transfer of legal title to real property, without the wife's consent, did not destroy her right of dower upon her husband's death.
>
> However, when the General Assembly abolished the estates of dower and curtesy by Chapter 3, § 1 of the Laws of Maryland 1969, now Code (1974), § 3-202 of the Estates and Trusts Article, it effectively destroyed any valid distinction between the rights of a surviving spouse to share in the personalty or real property of the deceased spouse. Therefore *the only manner in which a widow may now seek to set aside an inter vivos transfer of property made by her husband is by proof that he defrauded her by not absolutely and unconditionally relinquishing control over the property during his lifetime.* In the absence of fraud, the only interest she can assert in lieu of taking under her husband's will is to a share of the property owned by her deceased husband at the time of his death. *See* Code (1974, 1978 Supp.), §§ 3-102, 3-203 of the Estates and Trusts Article."
> (Emphasis added.)

285 Md. at 697, 402 A.2d at 896. Judge Cole *emphasized* the importance of the threshold inquiry into the transaction itself: did the grantor retain some degree of control over the

property? Unlike the instant case, the deceased husband in *Grove* absolutely and unconditionally surrendered control of the marital residence to a third party. Consideration of the factors enumerated in *Whittington* was, therefore, unnecessary. Mr. Hadfield in this case, however, did retain a significant degree of control over the property. Thus, it was incumbent upon the chancellor to address the relevant *Whittington* factors to determine if the *inter vivos* conveyance was intended to defraud appellee of her marital rights. In view of the extensive record in this case we shall leave it to the chancellor's discretion to determine whether it is necessary to hear more testimony on remand.

## III

After remand and consideration of the relevant "*Whittington* factors," the chancellor could conclude that the conveyance of the property was not intended to defraud appellee of her marital rights. Consequently, the former marital residence would be owned by the Church and the property altogether excluded from Mr. Hadfield's estate. He could, however, decide that the *inter vivos* transfer defrauded appellee of her marital rights and the property would devolve into the estate. Therefore, we shall address the second issue raised by appellant.

Appellant argues that if the deed was intended to defraud appellee of her marital rights, her claim to the property must be limited to one-half because the elective share statute, Md. Est. & Trusts Code Ann. § 3-203 (b) (1981 Cum.Supp.), establishes the "measure" of her interest in the estate.[7] We

---

7. *Montgomery v. Michaels,* 301 N.E.2d 465 (Ill. 1973), the leading case cited by appellant in support of its theory that Mrs. Hadfield is limited to a half share of the marital home, involved a "Totten Trust" and the widower's statutory share. The applicable statute, Ill.Rev.Stat. 1969, ch. 3, para. 11, covered a surviving spouse's share of the intestate estate, not a renunciation of a will and an elective share. Therefore, the court's rationale in treating the trust as testamentary and awarding the husband a one-third share does not help appellant's argument. The other cases cited by appellant are similarly inapposite. In *Ibey v. Ibey,* 43 A.2d 157 (N.H. 1945), the surviving spouse, who renounced under the will, claimed that U.S. savings bonds bought by the husband and left to a son and two grandsons were a fraud on her marital rights. The court held that the bonds were valid

disagree for several reasons and conclude, as the chancellor did below, that the distribution of the estate should be determined by the laws of intestate succession because Mr. Hadfield died without a will. *See Id.* at § 3-102.

First, appellant suggests that appellee's ability to maintain this suit is based solely on her status as a spouse defrauded of her marital share. In fact, Mrs. Hadfield brought the suit as personal representative under § 7-401 to prosecute an action which would benefit the estate. *See Biro v. Schombert,* 41 Md. App. 658, 398 A.2d 519 (1979), *vacated on other grounds,* 285 Md. 290, 402 A.2d 71 (1979). Furthermore, she was acting individually under § 2-102 (c) of the Estates and Trusts Article as an interested person seeking to resolve a question concerning the estate. Appellee's assertion of a claim based upon the alleged fraud perpetrated against her marital rights does not eclipse her standing as a properly appointed personal representative or as a sole surviving heir.

Secondly, we cannot agree with appellant's contention that protection against fraud on marital rights exists only in the elective share statute. Appellant's brief provides a lengthy history of the fraud on marital rights doctrine and its application in the case law as a restraint upon the ability of one spouse to disinherit the other. A surviving spouse as sole heir can elect against the will of the deceased spouse and

---

contracts with the United States for the benefit of third parties. *Ackers v. First National Bank of Topeka,* 387 P.2d 840 (Kan. 1964), *modified,* 389 P.2d 1 (1965), involved the interpretation and application of specific state statutes governing the right of a nonresident wife to the decedent's real property in trust. *Wanstrath v. Kappel,* 201 S.W.2d 327 (Mo. 1947), also involved a trust and a will which the widow renounced in favor of a one-third share. The Court stated, *id.* at 330:

> "The general rule of law . . . is that a conveyance of property by the husband without a consideration and with the intent and purpose to defeat his widow's marital rights in his property, is a fraud upon such widow and she may sue in her own right, and set aside such fraudulent conveyance, and recover the property so fraudulently transferred, *to the extent of her interest therein.*" (Emphasis added, *quoting* Merz v. Tower Grove Bank & Trust Co., 130 S.W.2d 611, 617 (Mo. 1939)).

The extent of this interest was set by statute; in *Wanstrath,* it was one-third. *Id.* at 329. In this case, it is the whole estate.

receive one-half of the estate. Md. Est. & Trusts Code Ann. § 3-203 (b) (1981 Cum.Supp.). Clearly, this section envisions considerable protection of marital rights.

Section 3-102 also recognizes the rights of a surviving spouse, although in an intestate situation. If a spouse dies without a will, the other, as sole surviving heir, is entitled to the entire estate. A surviving spouse claiming that an *inter vivos* conveyance was a fraud on her right to the intestate share of the decedent's property under § 3-102 is not limited by the portion prescribed in § 3-203.

Finally, the theory advanced by appellee is contrary to the plain language of the statutory provisions covering testate and intestate succession. The introductory phrase of the elective share provision, § 3-203 (a), "Instead of property left to him by will ...." Clearly, the existence of a will is a prerequisite to applying any of the principles that follow. By contrast, the introductory sentence in the intestate title, § 3-101, states, "Any part of the net estate of a decedent not effectively disposed of by his will ...." Obviously, the non-existence of a will is a prerequisite to distributing property under the provisions that follow. Thus, the two sections covered two distinct situations, intestacy and testacy. *See Marriott v. Marriott,* 175 Md. 567, 3 A.2d 493 (1938) (statute of distribution in intestacy has no application where decedent left a will, *citing Harris v. Harris,* 139 Md. 187, 114 A. 909 (1921)).

> *Case remanded, without affirmance or reversal, with instructions to the chancellor to make findings not inconsistent with this opinion; costs to be equally divided by appellant and appellee.*